UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY JOSEPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:18-cv-00443-LEW |
| | ) | |
| LINCARE, INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## ORDER ON DEFENDANT, LINCARE, INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Jeffrey Joseph, filed this action against Defendants Lincare, Inc., Family Practice On The River d/b/a Kennebunk Walk-In Clinic, Inc., and Patrick Butcher, claiming Defendants intentionally discriminated against him on the basis of his race. Mr. Joseph brings claims for damages suffered as a result of the alleged discrimination under federal and state law.

Now pending is Defendant Lincare, Inc.'s Motion for Summary Judgment (ECF No. 46). Defendant seeks judgment as a matter of law on Plaintiff's discrimination claims because it argues it did not treat Plaintiff differently because of his race. For the reasons discussed below, Defendant's motion is GRANTED.

### SUMMARY JUDGMENT FACTS

The summary judgment facts are drawn from the parties' stipulations, if any, and from their statements of material facts submitted in accordance with Local Rule 56. The

1

Court will adopt a statement of fact if it is admitted by the opposing party and is material to the dispute. If a statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018).

This case arises out of an employment dispute between the Plaintiff, Jeffrey Joseph and his former employer, Lincare, Inc., surrounding Lincare's decision to fire Mr. Joseph on March 27, 2017. Mr. Joseph alleges that in so doing Lincare deprived him of his rights to equal racial treatment under federal and state law.[1]

Lincare is a Florida-based corporation that supplies respiratory therapy products and services to patients in the home. Defendant Lincare's Statement of Material Facts ("DSMF") DSMF ¶ 2. Lincare works with physicians and medical offices throughout Maine and across the country—called referral sources—to identify and service patients who will benefit from Lincare's products and services. DSMF ¶ 2. Mr. Joseph worked for Lincare as a sales representative at the company's Falmouth, Maine location from January

---

[1] Plaintiff voluntarily dismissed his retaliation claims against Lincare in Counts II, IV, and V, leaving only Count I, alleging disparate treatment race discrimination under 42 U.S.C. § 1981, and Count III, alleging disparate treatment race discrimination under the MHRA. *See* Pl's Opp. at 2.

2

18, 2017 until his termination on March 27, 2017. DSMF ¶ 7. Mr. Joseph's duties included selling medical equipment, building relationships with referral sources, resolving complaints, and obtaining documentation from clients. DSMF ¶ 8.

On March 23, 2017, Mr. Joseph made a sales call to Defendant Family Practice on the River d/b/a "Kennebunk Walk in Clinic" ("KWIC" or "the Clinic"). Lincare had asked Mr. Joseph to go to the Clinic to pick up a "certificate of medical necessity" for one of its patients, and to get a signature from the Clinic for insurance purposes. DSMF ¶ 10. When he arrived, Mr. Joseph first sought the certificate of medical necessity at the Clinic's front desk. DSMF ¶ 12. Shortly thereafter, Defendant Patrick Butcher, the Clinic's manager, entered the room and informed Mr. Joseph that the Clinic's doctor did not want to speak with him, and that the Clinic had no interest in working with Lincare. DSMF ¶¶ 11, 13. Mr. Joseph asked if he could set up a meeting with the doctor, but Mr. Butcher insisted that they were no longer interested in using Lincare and the doctor did not want to meet. DSMF ¶¶ 14-15. Mr. Butcher then told Mr. Joseph to leave the clinic. DSMF ¶ 16.

After leaving, Mr. Joseph called his manager, Dennis Lizotte, to tell him about the sales call. DSMF ¶ 17. Mr. Joseph recounted that he felt Mr. Butcher had disrespected him, discriminated against him based on his color, that the Clinic would not sign the certificate of medical necessity, and that the interaction left Mr. Joseph so nervous and scared that he wanted to file a complaint with the police department. DSMF ¶ 19, PSAMF ¶ 6. That same day, Mr. Joseph went to the Kennebunk Police Department to fill out a police report about the incident. DSMF ¶ 20.

After talking with his supervisor, Mr. Joseph called the Clinic to try to speak with Mr. Butcher again. DSMF ¶ 20. On the call, Mr. Joseph described Mr. Butcher's behavior as "disrespectful," and Mr. Butcher, in turn, described feeling threatened when Mr. Joseph said "I will be back, you don't know who I am." DSMF ¶¶ 21-22. After a brief conversation, Mr. Butcher hung up on Mr. Joseph. DSMF ¶ 23. Mr. Joseph called the Clinic back multiple times that day, but did not speak with Mr. Butcher again. *Id*.

Mr. Butcher then called Mr. Lizotte to complain about Mr. Joseph's behavior. DSMF ¶ 26. Mr. Butcher described Mr. Joseph by his physical appearance including height, race, and accent because he did not know Mr. Joseph's name. *Id*. Mr. Lizotte provided Mr. Joseph's name on the call. DSMF ¶ 27. Mr. Butcher then described how Mr. Joseph had bothered him and his staff during the sales call and asked that Mr. Joseph be terminated immediately. DSMF ¶ 28. Mr. Lizotte rejected this demand; he explained that he would not fire an employee over the phone and that he needed to have a chance to talk to Mr. Joseph again after things had settled down. DSMF ¶ 29.

Mr. Butcher sent a follow-up letter to Lincare's CEO, CFO, President, and four Directors describing the March 23 incident with Mr. Joseph. DSMF ¶ 30. In his letter, Mr. Butcher described Mr. Joseph as "about 6 feet 4 inches, mid 30's African American with what seem [*sic*] to be a Jamaican accent," recounted that Plaintiff called him repeatedly, saying "[o]h I'll be back—you don't know who I am," and that he was contemplating filing a complaint for criminal trespass. DSMF ¶¶ 30-33, Plaintiff's Opposing Statement of Material Facts ("POSMF") ¶ 33. Mr. Butcher gave a deadline of

March 31, 2017 to respond to his letter, and in the absence of a "mutually agreeable settlement," he threatened to take "legal action, contact the media, etc." POSMF ¶ 30.

Several days later, Mr. Lizotte's manager at Lincare, Tarrah Filo-Loos, called the Clinic and apologized to Mr. Butcher for what had happened on March 23. DSMF ¶¶ 34-35. After receiving the apology, Mr. Butcher testified that he felt satisfied the situation was resolved. DSMF ¶ 35. On the following Monday, March 27, Ms. Filo-Loos called Mr. Lizotte to discuss what had happened at the Clinic. DSMF ¶ 37. On this call, Ms. Filo-Loos asked why Mr. Lizotte did not fire Mr. Joseph right away after the incident. DSMF ¶ 38. Mr. Lizotte responded that from what he had been told, the encounter seemed out of character and he was not worried about future problems with Mr. Joseph. DSMF ¶ 39.

During this conversation, however, Mr. Lizotte learned about Mr. Joseph's multiple calls to the Clinic on March 23rd, and the two agreed to terminate Mr. Joseph's employment. DSMF ¶ 40.[2] The record reflects Lincare had two overlapping reasons to fire Mr. Joseph: because he "did not know when it was time to leave an office," and because he called the Clinic repeatedly in an unprofessional manner. *See* DSMF ¶¶ 42-43, POSMF ¶¶ 42-43.[3] Because Mr. Joseph was still within his ninety-day trial period with Lincare, company policy did not require progressive steps of discipline, and termination could be

---

[2] Although Plaintiff denies this fact, he cannot point to any admissible record evidence to refute Mr. Lizotte's sworn deposition testimony that he learned about Mr. Joseph's repeated calls to the clinic during his call with Ms. Filo-Loos. *See* Fed. R. Civ. P. 52(c)(2), POSMF ¶ 40.

[3] Plaintiff attempts to deny these facts with unauthenticated and hearsay evidence, which I will not consider because neither is admissible at trial. *See* Fed. R. Civ. P. 52(c)(2); See also, Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 666 (1st Cir. 2010) ("unauthenticated, unsworn document" could not be relied upon at summary judgment).

immediate. DSMF ¶¶ 47, 49. In line with this policy, Mr. Lizotte informed Mr. Joseph of the termination that same day, and gave Mr. Joseph an opportunity to describe his version of the March 23 incident at the Clinic. DSMF ¶ 45. Mr. Joseph did not speak to anyone higher up at Lincare about his termination, or to anyone in the company's human resource department. Other than the March 23 incident, Mr. Lizotte testified that Mr. Joseph was personable, well-received by the majority of the referral sources, laid back, eager to learn and that he had not received any other complaints. PSAMF ¶¶ 26-27.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing summary judgment must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in its favor. *See Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

6

A. **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant moves for summary judgment on Plaintiff's two remaining claims of intentional race discrimination under federal and Maine state law. 42 U.S.C. § 1981, 5 Me. Rev. Stat. § 4572. Plaintiff brings his federal claim under Section 1981, which the First Circuit has analyzed using the same framework as Title VII because the two statutes "hinge upon identical legal standards." *Conward v. Cambridge School Committee*, 171 F.3d 12, 18-19 (1st Cir. 1999). Plaintiff's state law claim under the Maine Human Rights Act ("MHRA") 5 Me. Rev. Stat. § 4572, likewise overlaps with Title VII. *Carnicella v. Mercy Hosp., 168 A.3d 768, 774 n.3* (Me. 2017) ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA."); *see also Huard v. Kennebec Cty.,* No. 1:16-CV-00473-GZS, 2019 WL 1264864, at *11 (D. Me. Mar. 19, 2019*)*. Because there are no material differences between the statutory provisions at issue, I will analyze the claims for intentional race discrimination under Section 1981 and the MHRA together.

1. **Plaintiff's Claims For Intentional Race Discrimination**

Plaintiff alleges that Defendant intentionally discriminated against him on the basis of race in violation of 42 U.S.C. § 1981 when it terminated his at-will employment. Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Supreme Court has held that District Courts should use the *McDonnell Douglas* burden-shifting analysis when analyzing Section 1981 claims. *See Patterson*, 491 U.S. at 186 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and holding that the "scheme of proof" prescribed therein "should apply to claims of racial discrimination under § 1981").

Under the familiar burden-shifting framework applicable to race discrimination cases in which no direct evidence of discrimination exists, the first step for any plaintiff is to adduce a prima facie case. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Then, the defendant has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991). If the defendant accomplishes this task, the plaintiff then reclaims the burden of production. In order to meet this burden, the plaintiff must offer evidence showing that the defendant's proffered reason is a sham, and that discriminatory animus sparked the defendant's actions. *See Id.* at 804–05, 93 S.Ct. 1817; *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990). Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion. *See Mesnick*, 950 F.2d at 823.

   a. *Whether At-Will Employees Have Contractual Rights Under § 1981*

Defendant first argues that Plaintiff cannot sustain a § 1981 race discrimination claim because § 1981 does not apply to at-will employees like the Plaintiff. Defendant premises this argument on the fact that "[i]n order to fall within the purview of Section 1981, Plaintiff must first establish that he had a contractual relationship with Lincare," and

that "Plaintiff in this case did not have an employment contract with Lincare."  Pl.'s Resp. (ECF No. 46) at 6.  But just because he is an at-will employee does not mean Plaintiff was not "in a contractual relationship" with the Defendant.  Although the First Circuit has yet to address this issue, all other circuits to take up the question have all agreed that an at-will employee has a cause of action under § 1981 through their employment contract.  *See, e.g., Lauture v. IBM Corp.*, 216 F.3d 258, 261 (2d Cir. 2000) (Section 1981 applies to at-will employees; at-will employment is a "contractual relationship whereby the employee covenants to perform services for the employer and the employer covenants to compensate the employee until one of them terminates the relationship").[4]

I find the precedent from our sister circuits persuasive.  Although Mr. Joseph did not have a long-term employment contract, his 90-day trial period with Lincare created a contractual relationship, which in turn entitles him to the protections of Section 1981.  Just because Mr. Joseph does not have a right to "for cause" termination does not mean he forfeits the guarantees to equal racial treatment provided him by federal law.  As a result, I will deny Defendant's motion on this ground.

  b. *Prima Facie Case for Relief*

Defendant Lincare further argues that Plaintiff has failed to make out a *prima facie* case on his claim of race discrimination under either Section 1981 or the MHRA.  To make out a *prima facie* case, "(1) the plaintiff must be a member of a protected class; (2) []he must be qualified for her job; (3) []he must suffer an adverse employment action at the

---

[4] *See also Walker v. Abbott Laboratories*, 340 F.3d 471, 476-77 (7th Cir. 2003)(collecting cases).

hands of h[is] employer; and (4) there must be some evidence of a causal connection between h[is] membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications." *Bhatti v. Trustees of Boston University*, 659 F.3d 64, 70 (1st Cir. 2011). Only a "relatively low threshold showing [is] necessary to establish a *prima facie* case." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003). Defendant argues there is no evidence of prongs (2) and (4)—that Mr. Joseph met Lincare's expectations and that any causal connection exists between his membership in a protected class and his termination.

Defendant first argues that Plaintiff cannot make out a *prima facie* case that Mr. Joseph met Lincare's employment expectations. Pl.'s Resp. at 7. As evidence, Defendant points to Mr. Joseph's "being asked to leave the Clinic" on March 23 as well as his repeated and unwanted follow-up calls later that day. *Id*. In interrogatory responses, Defendant raised three specific employer expectations or policies Mr. Joseph supposedly violated in his interaction with Mr. Butcher and KWIC: "#1 Insubordination, e.g., willful disobedience of instructions properly issued by supervisor. #4 Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language. #17 Failing to exhibit self-control to customers and/or fellow employees." ECF No. 51-1 at 4. The March 23 incident at KWIC is the only episode where Mr. Joseph is alleged to have violated these or any other of Defendant's policies. *See id.*

But whether Mr. Joseph violated Lincare's policies on March 23 is in dispute, and there is at least as much evidence suggesting he met or exceeded Lincare's employment

10

expectations overall. First, Mr. Joseph paints a different picture of the March 23 incident at KWIC; according to his version, he acted professionally and was verbally abused by Mr. Butcher. POSMF ¶ 16. As Mr. Joseph tells it, he was not insubordinate, indecent or harassing, and did not "fail to exhibit self-control to customers." *See id.* Furthermore, his supervisor Mr. Lizotte testified that Mr. Joseph was otherwise very personable, well received by the majority of referral sources, laid back, interested in learning and following instructions, and had "excellent" interpersonal skills. PSAMF ¶¶ 25-26. At this stage, making all factual inferences in favor of the nonmoving party, I find Mr. Joseph has made a *prima facie* case that he met his employer's employment expectations.

Defendant also argues that Plaintiff has failed to make a *prima facie* showing of the causation prong of his § 1981 claim. As the First Circuit has noted, the *prima facie* case is a flexible standard, and the causation prong varies depending on the circumstances of the Plaintiff's case. *See Cham v. Station Operators, Inc.,* 685 F.3d 87, 93 (1st Cir. 2012*)*. Defendant believes Mr. Joseph must show "that similarly situated employees were treated differently" to make a *prima facie* case. ECF No. 46 at 11. But Plaintiff is not required to show that he was treated differently than other similarly situated employees outside the protected class as part of establishing a *prima facie* case. *Conward*, 171 F.3d at 19. The First Circuit rejected this very argument in *Conward*, where it held that "the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality, *vel non,* of the employer's articulated reason for having acted adversely to the plaintiff's interests." *Id*. Mr. Joseph must present some evidence of a causal connection, but that evidence does not

have to be in the form of a comparison with other similarly-situated Lincare employees to make a *prima facie* case.

Based on the First Circuit's guidance that a *prima facie* case is a "small showing," "not onerous," and "easily made," I find that Plaintiff has advanced enough of a case to satisfy this requirement. *See Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). While there is no direct evidence of racial discrimination or disparate treatment, Mr. Joseph can point to the letter Mr. Butcher sent to Lincare as *some* evidence that his termination *might* have been racially motivated. In that letter, Mr. Butcher referred to the Plaintiff as "African American" and having a "Jamaican accent" when describing the Plaintiff's significant physical size, which could support an inference, however faint, that his employer based its termination decision on this description. *See* ECF No. 15-2 at 1. Mr. Butcher had also referred to the Plaintiff as a "rasta-looking sales representative," and described Plaintiff by his race, size and accent when calling Mr. Lizotte immediately after the incident. DSMF ¶ 26, PSAMF ¶ 28-29. The letter served as the basis for a conversation between Ms. Filo-Loos and Mr. Lizotte, where the two mutually arrived at the decision to terminate Mr. Joseph's employment. DSMF ¶ 42.

Significantly, Plaintiff does not impute Mr. Butcher's alleged racial animus to Lincare. Under the so-called "cat's paw" theory of liability, an employer may be liable for discrimination where it makes an adverse employment decision based on the report of a biased third party without conducting an independent investigation, even if the decision-maker did not act with discriminatory animus. *See, e.g.*, *Cariglia v. Hertz Equip. Rental*

12

*Corp.*, 363 F.3d 77, 83 (1st Cir.2004). Plaintiff, instead, argues that Lincare independently engaged in its own racially-motivated conduct when it "agree[d] with Butcher's racially hostile perspective" that "a 6'4" black man with an accent is someone to fear." ECF No. 59 at 18. The causal link Plaintiff alleges is "that Lincare fired Plaintiff relying only on Butcher's statements and its independent interpretation thereof." Dkt. 59 at 18. I will therefore not analyze Lincare's behavior under the "cat's paw" theory of liability.

Having found that Plaintiff presented a *prima facie* case of discrimination on the basis of his race, the burden shifts to the Defendant to present a "legitimate, non-discriminatory reason[] for the challenged conduct." *Bhatti*, 659 F.3d at 70. If Lincare succeeds in presenting a legitimate, non-discriminatory reason for firing Mr. Joseph, the burden shifts back to Plaintiff to show that "these reasons, though facially legitimate, are actually pretextual." *Id.*

### c. *Legitimate, Non-Discriminatory Reason for Termination*

Lincare carries its burden of presenting a legitimate, non-discriminatory reason for terminating Mr. Joseph. The First Circuit has held that violation of a company's code of conduct counts as a "legitimate, non-discriminatory reason" for firing an employee. *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 449 (1st Cir. 2009). And in this case Lincare cited Mr. Joseph's violation of several company policies as its reason for firing him, including "#4 Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language, and #17 Failing to exhibit self-control to customers and/or fellow employees." ECF No. 51-1 at 4. Following Mr. Joseph's confrontational visit at KWIC, and his repeated calls to the Clinic later that day, Lincare received both a call and

a letter from a former client upset by Mr. Joseph's actions. DSMF ¶¶ 23, 25, 30-31. After reviewing the incident, both supervisors—Ms. Filo-Loos and Mr. Lizotte—agreed to fire Mr. Joseph for unprofessional and potentially harassing behavior. DSMF ¶ 42, ECF No. 52 at 4. Defendant has satisfied the second prong of the *McDonnell Douglas* test, shifting the burden back to the Plaintiff to show that the Defendant's stated non-discriminatory rationale for termination is pretextual.

*d. Pretext*

Because Lincare proffered a legitimate, nondiscriminatory rationale for its actions, the burden reverts to Mr. Joseph to make the ultimate showing that he was discriminated against based on his race. *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007) ("At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of" membership in a protected class.). Mr. Joseph must show both that Lincare's articulated reasons for taking adverse action against him were mere pretexts and that its true motive was discriminatory. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir. 2000). The same evidence debunking the employer's proffered explanation may itself support an inference of discriminatory animus. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 34 (1st Cir. 2001).

Plaintiff's claims do not rely on an assertion that his white co-worker's misconduct was punished less harshly than his own. Instead, Plaintiff believes he did not engage in any misconduct, but was punished anyway because of his race, without an opportunity to

14

explain the racially motivated allegations against him. ECF No. 50 at 15. He argues that Defendant's stated reason for firing him is pretextual for two reasons: first, because Defendant had "several inconsistent and irreconcilable reasons" for firing him, and second, because he did not receive the "proverbial 'day in court'" offered to other Lincare employees prior to their termination. *Id.* at 16. Mr. Joseph does not advance any specific evidence of racial animus on the part of Lincare, so I will assume he believes the pretext evidence reveals a racially-motivated decision to terminate his employment.

First, Plaintiff argues that because Defendant changed its stated rationales for firing him over time, those rationales are pretextual. As the First Circuit has noted, "[a] company may have several legitimate reasons to dismiss an employee. But when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual." *Dominguez-Cruz v. Suttle Caribe, Inc*, 202 F.3d 424, 432 (1st Cir. 2000). Here, Lincare has offered two different reasons for firing Mr. Joseph: that he "did not know when it was time to leave an office..." POSMF ¶ 42, and that he inappropriately called the Clinic several times after his initial visit on March 23. PSAMF ¶ 8, DRASF ¶ 8. Plaintiff believes these explanations are "inconsistent" and "contradictory," and therefore support the inference that Defendant's stated decision to fire him is a pretext for racial animus.

The evidence does not bear Plaintiff's theory out. The parties agree that Defendant's decision to fire Mr. Joseph grew out of the March 23 confrontation at KWIC, and the subsequent interactions between Mr. Joseph and Mr. Butcher. *See* DSMF ¶ 42, PSAMF ¶¶ 17-18. The record suggests that two aspects of Mr. Joseph's behavior *both* contributed

to Defendant's decision to fire him: he out-stayed his welcome at the Clinic on March 23, and continued to call the Clinic later that day after having been unequivocally turned away by Mr. Butcher. DSMF ¶¶ 23, 28, 42-43. That Defendant states these rationales differently in the record, and at different times, is not evidence of pretext, but evidence that there were multiple factors contributing to the decision to terminate. Defendant's reasons are related and overlapping, rather than "inconsistent" or "contradictory," as Plaintiff contends. This kind of "subjective speculation and suspicion" does not support Plaintiff's argument that Defendant's decision to fire was pretextual. *See Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 317 (1st Cir. 2016). Therefore, I find that Plaintiff's first argument concerning pretext is without merit.

Plaintiff also contends that Defendant's failure to offer him his "proverbial day in court" to explain himself prior to his termination is evidence of pretext. Again, the record does not support Plaintiff's argument. Mr. Joseph had only been working for Lincare for two months, still well within his 90-day "trial period" with the company. DSMF ¶¶ 46-47. During that 90-day period, Lincare treated its employees as "at-will" and did not open up their typical Problem Resolution Procedure or other disciplinary procedures to those at-will employees they planned to let go. DSMF ¶¶ 46-48. Mr. Joseph has not produced any evidence that other employees within this 90-day window ever received more of a grievance procedure prior to termination. *See generally* PSAMF ECF No. 51. The evidence therefore points to this being a typical, routine firing of an employee during the 90-day trial period, and does not imply Lincare's stated reasons for firing Mr. Joseph were pretextual in any way. If anything, the evidence suggests Lincare fired Mr. Joseph

16

according to normal procedure, and that there was nothing extraordinary about his termination. As a result, I find that Plaintiff's second argument also fails to establish that Defendant's stated reasons for firing him were pretextual.

## CONCLUSION

Having considered Plaintiff's arguments and the entire summary judgment record, I find that Plaintiff cannot point to any evidence that would suggest Defendant's legitimate, non-discriminatory reason for terminating him was pretextual. Because Plaintiff cannot establish pretext, I find that he has failed to meet his burden under *McDonnell Douglas*, to show that he has suffered racial discrimination under either Section 1981 or the MHRA. Therefore, Defendants' Motion for Summary Judgment (ECF No. 46) is **GRANTED**.

**SO ORDERED.**

Dated this 22nd day of October, 2019.

/s/ Lance E. Walker
U.S. District Judge